**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

                                  **Plaintiff,**

     **vs.**                                       **1:20-CV-1101**
                                                **(MAD/CFH)**

**MARK L. TIMON and DEBORA M. TIMON,**

                                  **Defendant.**
_____

| APPEARANCES: | OF COUNSEL: |
| --- | --- |
| **UNITED STATES DEPARTMENT OF JUSTICE** | **JULIA GLEN, ESQ.** |
| P.O. Box 55 Ben Franklin Station | **PHILIP L. BEDNAR, ESQ.** |
| Washington, D.C. 20044 | |
| Attorneys for the Government | |
| | |
| **O'CONNELL & ARONOWITZ, P.C.** | **KEVIN LAURILLIARD, ESQ.** |
| 54 State Street, 9th Floor | **PETER A. PASTORE, ESQ.** |
| Albany, New York 12207 | |
| Attorneys for Defendants | |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

On September 14, 2020, the United States commenced this action to (1) enforce federal

tax liens that attached to certain property or rights to property of Defendants prior to their joint

bankruptcy petition and thus survived regardless of whether they were discharged from personal

liability, and (2) to reduce to judgment against Defendants the balance of the tax liabilities to the

extent that they are determined to be excepted from discharge under 11 U.S.C. § 523(a)(1)(C).

_See_ Dkt. No. 1.

The Complaint in this action presents three counts and the preliminary relief sought pertains only to the first two, to enforce tax liens against property and rights to property by Defendant Mark Timon, although the allegations of the third count – seeking a judgment that depends on overcoming the defense of discharge in bankruptcy – are necessary to understand the relief sought in the first two counts, as well as the present motion.

On September 18, 2020, this Court issued a temporary restraining order and order to show cause granting the *ex parte* motion of the United States prohibiting any future payments to be made by New England Greens, LLC d/b/a Vibrant Health ("New England Greens" or "NEG") to Defendants or any entity controlled by Defendants.  *See* Dkt. No. 6.  Defendants did not oppose the initial temporary injunction, which remains in effect.  Thereafter, the United States filed a motion for a temporary restraining order to supplement and expand the original temporary restraining order and to grant a preliminary injunction.  *See* Dkt. No. 14.  The motion for an expanded temporary restraining order seeks an order that, in addition to the relief granted in the original order, but also to freeze any and all funds and payments made from NEG to Defendants from December of 2014.  *See id.*  Further, the expanded temporary restraining order application requests an accounting of all such payments or transfers of $3,000 or more.  *See id.*

Following a hearing on the United States' motion and upon receipt of the parties' supplemental briefing on the issues, the Court finds that the United States has met its burden and the motion for a preliminary injunction is granted as set forth below.

## II. BACKGROUND

A.      **Procedural History**

Prior to their bankruptcy petition on July 15, 2011, Defendants had over $1.5 million in joint federal tax liabilities by failing to pay all but small fraction of their taxes incurred on income

during years 2002-2007.  Defendants adjusted gross income for 2002 through 2006 varied between $200,000 and $400,000, and it was over $2,000,000 in 2007, in part due to the sale during that year of their ownership interests in a company named New England Greens, LLC.  As of July 15, 2011 bankruptcy petition, the liability for 2007 made up almost $640,000 of the $1,500,000 total liability.

For tax years 2008, 2009, and 2010, Defendant paid their income taxes.  According to the Government, this was done as part of Defendants' planned bankruptcy because taxes due up to three years prior to a bankruptcy petition are priority claims and automatically nondischargeable.  However, with additional adjusted gross income during 2008, 2009, and 2010 of over $1,000,000 combined, Defendant did not pay down any of the 2002-2007 tax liabilities, with the exception of a single payment of $24,000 paid in December of 2008, applied to tax year 2006.[1]

Defendants proposed a Chapter 11 plan before the Bankruptcy Court, which the United States claims improperly tried to declare that, apart from promising plan payments that would total $507,514 over 15 years, the balance of the $1,500,000 in tax liabilities would be discharged upon confirmation.  *See In re Timon*, No. 11-12277, Dkt. No. 49 at 4-5, 8 (Bankr. N.D.N.Y.).  The United States objected to the plan's amended disclosure statement, indicating in its objection that it would object to any plan that attempted to determine dischargeability.  *See* Bankr. Dkt. No. 63 at 5-6.  The plan was amended but still contained a discharge declaration and the United States again objected, this time adding that there was a "strong likelihood that the Debtors will be deemed to have 'willfully attempted in any manner to evade or defeat [the] tax[es]' and that the exception to discharge" in 11 U.S.C. § 523(a)(1)(C) applied.  *See* Bankr. Dkt. No. 85 at 14-15.

---

[1] Defendants also received offsets of tax overpayments under 26 U.S.C. § 6402(a) that were applied to the 2002 year from 2009 ($1,364.42) and 2010 ($3,149.51).

Additionally, bankruptcy counsel for the IRS informed Defendants' bankruptcy counsel that the issue of dischargeability was not ripe because an individual debtor's discharge comes only after completion of a plan and that a plan that is likely to succeed had to first be confirmed for there to be a ripe case or controversy over dischargeability.

Given the United States' stance, when a second amended plan (Bankr. Dkt. No. 121) was negotiated and confirmed, the order of confirmation contained the following provision regarding dischargeability and the ripeness issues:

> The debtors and the IRS agree that if either party brings an adversary proceeding for dischargeability before a discharge has been granted the other will not raise the defense that the claim is not yet judiciable because a discharge has not yet been granted. The parties further agree that any proceeding to determine the dischargeability of any part of the IRS' claim in this proceeding shall be brought within two years from the date a discharge is granted. If no such proceeding is brought within said two year period then all amounts due the IRS on the date of filing shall be deemed dischargeable.

Bankr. Dkt. No. 127 at 8. The plan was completed and the discharge granted on September 24, 2018. *See* Bank. Dkt. No. 165.[2] According to the United States, all of the liabilities for 2002

---

[2] According to the United States, because it filed this action within two years after the discharge, no issue arises as to the enforceability of the two-year deadline. The United States notes, however, that certain terms of the First Amended Plan of Reorganization filed on August 30, 2012, were negotiated with counsel for the United States after which certain terms of the Confirmation Order entered on December 10, 2013 (Bankr. Dkt. No. 127) reflected a settlement offer that had recently been accepted by a delegate of the Attorney General under 26 U.S.C. § 7122, and the two year deadline was never part of the offer and never accepted by the Attorney General's delegate with settlement authority. Rather, according to the United States, the approved settlement agreement, dated November 1, 2013, simply provided in pertinent part that "the parties have not made any agreement as to the dischargeability of any tax debt and discharge will be governed by 11 U.S.C. § 1141(d) and, thus § 523(a)(1)(C)." The two-year deadline was subsequently included in a draft confirmation order that debtor's counsel emailed to counsel for the United States and, the United States asserts that, "regrettably, the former trial attorney for the government did not object to that provision. The provision is void, given that it was not part of the agreement accepted by the Attorney General, and also violated the tax Anti-Injunction Act, 26

(continued...)

4

through 2005 have been satisfied, as is most of 2006.  The plan payments, however, were not sufficient to reach the large 2007 liability.  The United States claims that, as of July 27, 2020, the amount owed for 2006 and 2007 totaled $684,659.21, not including penalties.  According to the United States, the penalties are discharged but are nonetheless secured by liens against prepetition bankruptcy assets that are the subjects of Counts I and II of the Complaint and that the liens, including penalties, secure $1,048,305.34 as of July 27, 2020.  *See* Dkt. No. 5-2 at 6.

Counts I and II of the Complaint seek to enforce the federal tax liens for the 2006 and 2007 liabilities against property and rights to property that predate the bankruptcy petition, the value of which the United States claims was not provided for through the Chapter 11 plan, and which therefore remain encumbered by the prepetition tax liens.

**B.     Sale of New England Greens, LLC**

In March of 2007, Defendants sold their 100% interest in New England Greens, LLC for $1,800,000.00 (making up most of their adjusted gross income of over $2,000,000 in 2007). Additionally, in connection with the sale, Defendant Mark Timon entered into a consulting agreement with New England Greens (the "Consulting Agreement").  *See* Dkt. No. 5-1 at 6-20, 22-33.  The Consulting Agreement was an exhibit to the Interest Purchase Agreement dated November 8, 2006.  *See id.* at 13.  According to the Consulting Agreement, Defendant Mark Timon retained a contingent twenty percent (20%) interest in NEG, the contingency being the repayment by the company of a loan from CIT Small Business Lending Corporation.  *See id.* at 24, 41.

---

[2](...continued)
U.S.C. § 7421."  Dkt. No. 5-2 at 6 n.4.

The Bankruptcy Court's order confirming Defendants' Chapter 11 plan provided as follows:

> The IRS claim is also secured by the debtor, Mark Timon's, contingent interest in 20% of a company known as New England Greens, LLC. The debtors have agreed that this interest shall be abandoned at confirmation and pass through the bankruptcy with the IRS' lien attached and unimpaired. The IRS may levy or take other lien enforcement action against the interest. Mr. Timon will use his best efforts to obtain timely payment of the loan that will result in the transfer of the 20% interest to him, shall immediately notify the Department of Justice if the loan is repaid, and shall assist the IRS with its collection efforts against the 20% interest in New England Greens, LLC. . . . In return the IRS will give Mr. Timon 10% of all the funds it collects on the levy or other lien enforcement against this 20% interest and agrees that it will not seek to collect against the portion of the funds given to Mr. Timon provided they are maintained (and spent from) a separate account.

Dkt. No. 1 at ¶ 14. In August 2015, the United States was informed that the loan was paid in full and the 20% interest transferred to Mark Timon. *See id.* at ¶ 15; *see also* Dkt. No. 5-1 at 46. The United States contends that it is "entitled to enforce the federal tax liens ... against the New England Greens Interest pursuant to 26 U.S.C. § 7403 and to have the entire New England Greens Interest sold in a judicial sale (including by a receiver if requested by the United States), free and clear of all claims, liens, or interests of the parties, including any rights of redemption, with the proceeds of the sale distributed: first, to pay the costs of sale, including any expenses incurred to secure and maintain the New England Greens Interest; and second, to the United States to pay liabilities described above, except to the extent that the Court determines that another party has a superior right, title, or interest (and recognizing that the United States will be required to give Mark L. Timon 10% of what it collects, subject to any offset for any proceeds previously diverted to him)." Dkt. No. 1 at ¶ 16.

6

Additionally, pursuant to the Consulting Agreement, starting March 30, 2007, Defendant Mark Timon was to receive an annual consulting fee of $60,000 for ten years, plus commissions based upon a percentage of all company sales. *See* Dkt. No. 5-1 at 23-24. The Consulting Agreement states that, after ten years, the commission Mark Timon would receive from NEG was limited to one percent (1%) of the company sales from "March 30, 2017-thereafter." *Id.* at 24. The United States contends that, based on the language of the Consulting Agreement, "it does not appear that Mark Timon would provide any additional services to New England Greens to receive the 1% of company sales, rather it appears that the 1% compensation or distribution is additional consideration for the 2007 sale." Dkt. No. 5-2 at 7.

According to the Complaint, to the extent that Defendant Mark Timon received or may continue to receive non-employee compensation or other distributions from NEG, after March 30, 2017, that did not or does not depend on his provision of ongoing consulting services performed for NEG, such compensation constitutes additional consideration to Defendants for the sale of NEG and is therefore subject to the United States' federal tax liens which were not affected by the bankruptcy discharge. *See id.* at 7-8. The United States further alleges that Defendants have not made any voluntary payments towards the outstanding federal income tax liens for years 2006 and 2007 from amounts received from NEG. *See* Dkt. No. 5-1 at 48-54.[3] Pursuant to the 1099 Forms filed by NEG, Defendant Mark Timon received non-employee compensation in the amount of $426,000 for 2017, $329,491 for 2018, and $162,080 for 2019. *See id.* at ¶ 6. Since the Consulting Agreement indicates that Defendant Mark Timon's consulting obligations would terminate in March 2017, the United States maintains that the 2018 and 2019 distributions, and

_____

[3] The United States notes that it received $149,500 on October 30, 2018, pursuant to a term of the confirmation order that entitled the United States to 50% of the excess of any sale price for Defendants' former residence above $400,000. *See* Dkt. No. 5-2 at 8 n.6.

part of the 2017 distribution are attributable to the lifetime right to 1% of total sales receipts.  *See* Dkt. No. 5-2 at 8.

**C.      Initial Temporary Restraining Order and Subsequent Developments**

On September 17, 2020, the United States filed an *ex parte* motion for a temporary restraining order ("TRO").  The TRO, which the Court granted on September 18, 2020, ordered a temporary freeze of any payments and disbursements by non-party New England Greens, LLC, to Defendants, either based on the Consulting Agreement between NEG and Defendant Mark Timon or based on Defendant Mark Timon's twenty percent ownership interest or otherwise.  *See* Dkt. No. 6.  A hearing on the TRO was originally scheduled for October 2, 2020, but was rescheduled for October 29, 2020, upon the parties stipulation to provide for additional time.  *See* Dkt. No. 9.

Pursuant to the terms of the TRO, New England Greens provided the United States with records detailing payments from New England Greens to Defendants and other documents related thereto.  *See* Dkt. No. 14-1 at 5.  On October 19, 2020, the United States contacted Defendants' counsel to discuss its findings and the parties agreed that NEG is no longer making payments to Defendant Mark Timon pursuant to his twenty-percent interest in NEG or his indefinite right to one percent of sales.  *See id.*  Additionally, the United States informed Defendants' counsel that in July of 2016, a superseding consulting agreement was entered into (the "Amended Consulting Agreement"), under which Defendant Mark Timon no longer received a percentage of sales and only retains a twenty-percent interest in any liquidation dividend (after payment of company creditors) in the event of the liquidation of assets of the company, and was instead to receive fixed payments of $35,500 per month through February of 2019.  *See id.*

According to the United States, based on the terms of the Amended Consulting Agreement, if Defendants only received the fixed payments, they would have received $1,136,000

from July 2016 (the signing of the formal agreement superseding the original consulting

agreement) to February 2019 (32 times $35,500).  *See* Dkt. No. 14-2 at ¶ 5.  Additionally, the July

2016 Amended Consulting Agreement states that New England Greens started paying Defendant

Mark Timon a fixed payment of $35,500 "per month in lieu of commissions" on December 1,

2014.  *See id.*  The United States contends that, if Defendant Mark Timon received the fixed

payments starting in December 1, 2014, then he received approximately $1,810,500 from

December 2014 to February 2019 (51 times $35,500).  *See id.*  According to New England

Greens, however, the actual payments changed from $35,500 per month to $30,500 per month in

January 2018, and then to $26,500 per month in July 2018, until February 2019, although the

United States is unclear why these changes were made to the payment structure.  *See id.*

Accordingly, based on these figures, the actual total received from December 2014 through

February 2019 was $1,695,991.48.  Moreover, according to New England Greens, Defendants

received payments after February 2019 until December 2019, but that amount was substantially

less than previous amounts.  *See id.*  Finally, the United States notes that Defendants received

additional funds from other sources of income and Social Security.

Based on the information provided by New England Greens, the United States maintains

that its liens encumbered a substantial portion of the funds Defendants received after December

2014, or at least after July 2016 and the liens therefore continue to encumber any assets traceable

to any such payments made to Defendants or to any entity owned, controlled, or managed by

them, subject to further discovery by the United States.

**D.     Supplemental Injunction Request**

Prior to the hearing scheduled for October 29, 2020, the United States moved to

supplement the temporary restraining order.  *See* Dkt. No. 14.  In its motion, the United States

requests that, pursuant to the parties' agreement, the terms of the previously ordered temporary restraining order be included in a preliminary injunction. *See* Dkt. No. 14-1 at 7. Additionally, the United States seeks, over Defendants' objection, a supplemental temporary restraining order preventing Defendants from transferring, encumbering, spending or otherwise dissipating any of the remaining funds paid by New England Greens to them directly or through any entity they may own, manage, or control, or any other funds or assets that are traceable to such funds. *See id.* at 7-8. Additionally, the United States requests that the Court order Defendants to provide an accounting to the United States, including statements for all accounts into which payments from New England Greens from December 2014 through February 2019 were deposited or thereafter transferred, and also require them to describe all withdrawals or other debits of $3,000 or more reflected on such statements. *See id.* at 8. Because of the new requests, the hearing on the temporary restraining order and order show cause was adjourned to a later date.

**E.     Hearing**

At the hearing, the United States was instructed to present its case first which included testimony from Jason Andrews, CPA at Smith and Watson LLP (New England Greens' accounting firm), Jeffrey Santiago, Controller at New England Greens, and James Schulwolf, a partner at Shipman and Goodwin, LLP, the law firm that represented New England Greens in negotiations with Defendant Mark Timon that resulted in the 2016 Amended Consulting Agreements.

Through testimony and exhibits, the United States established the following at the hearing. Pursuant to the 2006 purchase agreement, Theodore Parker and Paige Johnson ("the Parkers") purportedly purchased the Timons' 100% ownership interest for $2 million. *See* Plaintiff's Hearing Exhibit ("Pl. Ex.") 5 at 5. Specifically, the purchase agreement states, "[u]pon the terms

10

and subject to the satisfaction of the conditions contained in this Agreement, in consideration of the aforesaid sale…[the Parkers] will at the Closing pay to [the Timons] $2,000,000 (the 'Purchase Price') in immediately available funds by wire transfer to the [Timons'] bank account." *Id.*

Defendant Mark Timon admitted in an email that the parties' agreement was for the Timons to sell their 100% ownership in NEG to the Parkers for a total sale price of $10 million by way of the following payment arrangement: $2 million at the time of sale, a contingent 20% membership interest in NEG satisfied when NEG's loan from CIT Small Business Lending Corporation was paid (accounting for another $2 million), and $6 million to be paid over the course of ten years "under the guise of a consulting agreement."  Pl. Ex. 31.

On March 30, 2007, Defendant Mark Timon entered into the original Consulting Agreement, which would remain in effect for ten years, or such earlier date if the consultancy were to be terminated.  *See* Pl. Ex. 5 at 32.  Section 3, Compensation and Benefits states as follows:

> (a) During the Term, the Company will pay to Timon consulting fees at the rate of  $60,000 per annum, in equal monthly installments.  The Company will pay to Timon additional compensation equal to a percentage of all sales based on the following applicable commission rate:

| | |
|---|---|
| March 30, 2007-March 29, 2008 | 4.3% |
| March 30, 2008-March 29, 2009 | 4.2% |
| March 30, 2009-March 29, 2010 | 4.1% |
| March 30, 2010-March 29, 2011 | 3.7% |
| March 30, 2011-March 29, 2012 | 3.1% |
| March 30, 2012-March 29, 2013 | 2.65% |
| March 30, 2013-March 29, 2014 | 2.38% |
| March 30, 2014-March 29, 2015 | 2.31% |
| March 30, 2015-March 29, 2016 | 2.21% |
| March 30, 2016-March 29, 2017 | 2.115% |
| March 30, 2017-thereafter | 1% |

11

*Id.* Thus, pursuant to the 2007 Consulting Agreement, Defendant Mark Timon was to be compensated $60,000 per annum from 2007-2017 and also 2.115% of sales from March 2016 to March 2017 and 1% thereafter.[4]

In addition to establishing the ongoing 1% of sales, the 2007 Consulting Agreement also established Mark Timon's 20% ownership interest in NEG.  While the 20% interest would not vest before a loan to CIT Small Business Lending Corporation was paid off, Section 3(c) states that, even prior to repayment of the loan, "the Company shall pay to [Mark Timon] 20% of any distribution, dividend, recapitalization or other return of profits (whether case or otherwise) to the members of the Company at the time of such distribution to the members of the Company." *Id.* at 33.  Subsection D states that when the loan is satisfied, "the Company shall issue to Consultant 20% of the outstanding membership interests in the Company." *Id.*  Defendant Mark Timon's bankruptcy counsel contacted the United States Department of Justice on August 11, 2015, informing the United States that the loan was satisfied and, as "[y]ou may recall that this was the event that would trigger transfer of the 20% of the outstanding membership interest of New England Greens, LLC to Mark Timon."  Pl. Ex. 19.

Defendant Mark Timon's accountant started discussions about renegotiating his 2007 Consulting Agreement, which ultimately resulted in three consulting agreements: an amended consulting agreement between NEG and Mark Timon, *see* Pl. Ex. 6 ("2016 Amended Consulting Agreement"), a consulting agreement between NEG and Bloomer Press and Audio Corporation

---

[4] The United States' complaint took the position that only 1% of sales represented rights to property subject to the prepetition tax liens and assumed that the 1% would continue indefinitely but claims that this position was before it became aware of the fact that the terms were designed to pay off the rest of the $6 million that was the secret part of the total purchase price.  The United States now assumes that the 1% "thereafter" would cease once $6 million was paid.  As such, the United States claims that this means that the tax liens actually encumbered all of the sales commissions rather than just 1%.

("Bloomer Press") (Pl. Ex. 7), and a consulting agreement between NEG and Ringmaster Events, LLC ("Ringmaster Events") (Pl. Ex. 8), all dated as of July 1, 2016.  James Schulwolf, a partner at Shipman and Goodwin, LLP represented NEG during these negotiations and testified at the preliminary injunction hearing that all three agreements were part of the same transaction.  *See also* Pl. Ex. 34 (Defendant Mark Timon explaining: "My desire is to keep that amount below $450,000 per year.  Any consulting payments made to Ringmaster Events and/or Bloomer Press can be considered as additional amounts that we will use to reduce the overall balance due for the interest purchase"); Pl. Ex. 35 (Mark Timon stating: "[I]f all parties on your side no longer want to direct $8,500 to Ringmaster, the $5,000 can be redirected to Bloomer Press, an LLC in which both Debbie and I also are members"); Pl. Ex. 38 (Mark Timon stating: "Paige asked us how much we received each month, asking if it were $50,000.  For reference, the total of consulting + Ringmaster + Bloomer payments is $44,000 per month.  Then, it was mentioned that perhaps there was room to increase the total of the monthly payments in order to accelerate the ultimate payoff"); Pl. Ex. 39 (Mark Timon proposing a plan that would eliminate the payments to Ringmaster to "simplify" and the second email shows that the drafts are moving payments between Mark Timon and Ringmaster, without any terms of services provided).  All three of these agreements were backdated to memorialize an informal agreement for fixed payments that started in December 2014.  *See* Pl. Exs. 6-8, 30, 35.  Therefore, it is the United States' position that the 2016 Amended Consulting Agreement between NEG and Mark Timon, the consulting agreement between NEG and Bloomer Press, and the consulting agreement between NEG and Ringmaster Events (collectively the "2016 Consulting Agreements") were one transaction to renegotiate the terms of the 2007 Consulting Agreement, as of December 2014, even though dated July 2016.  *See* Pl. Exs. 6-8, 30, 35.

13

Pursuant to Defendant Mark Timon's admissions, the Parkers purchased the Timons' 100%
ownership interest in NEG for $10 million by way of the following: $2 million at the time of
purchase, a contingent 20% membership interest (apparently valued at $2 million at the time of
sale), and $6 million under the guise of a consulting agreement. *See* Pl. Ex. 31. Prior to the
expiration of the 2007 Consulting Agreement, the parties renegotiated the terms to provide Mark
Timon with fixed payments. The July 2016 Consulting Agreements eliminated the percentage
sales distributions, including the ongoing 1% sales distributions that apparently would have
terminated after completing payment of the $6 million although not stated in the 2007 Consulting
Agreement, and converted Mark Timon's 20% full membership interest in NEG to a 20% residual
interest in the event of eventual dissolution, in exchange for fixed payments, for a time period that
would ensure complete payment of the initial $10 million purchase price of NEG. The nature of
these changes and reasons for their implementation is detailed throughout a series of emails
admitted over Defendants' objection at the preliminary injunction hearing and, in pertinent part
explained below. *See* Pl. Exs. 30-44.

### a. Consulting Agreement as Part of the 2006 Purchase

Defendant Mark Timon repeatedly admitted that the funds to be paid to him pursuant to
the 2007 Consulting Agreement were a component of the 2006 purchase price for his equity in
NEG and that they were not compensation for future services. For example, in Pl. Ex. 30, Mr.
Timon states as follows:

> The prior division of consulting fee and commissions was devised,
> as I recall, to put CIT's mind at ease, and is really unnecessary today
> given that both former commissions and consulting fees were taxed
> the same as regular income. It seems sensible to clearly identify the
> payments as consulting fees or to go even further and reclassify
> them as what they really are, extended payments for the 80%
> interest, which might make them taxable under capital gains for me.

> But at this late date, to do the latter may raise red flags for the IRS,
> and I'd prefer to leave that giant in slumber land, wouldn't you?

*See also* Pl. Ex. 31 ("…and the remaining six million dollar payout in the guise of a consulting

contract"); Pl. Ex. 32 ("the consulting agreement was a bogus invention… The portion of the

purchase price of $10 million allocated to a long-term payout was $6 million.  It was for some

reason, disguised as a consulting agreement"); Pl. Ex. 33 ("The bigger problem has become my

alleged 'consultation agreement.'  The other side continues to adjust that bogus agreement, when I

instead recommend that it be eliminated in favor of a new agreement that identifies the funds

allocated through the 'consulting agreement' as what they really are, namely payments for equity in

the company"); Pl. Ex. 35 ("The amounts paid under the guise of the consulting agreement are in

fact payments for equity in New England Greens"); Pl. Ex. 41 ("Let me restate my March 16

email: Given that the funds paid to me through the consulting agreement have been disguised

equity payments structured as 'consulting' payments in order to satisfy CIT, and given that the CIT

loan and its constraints are now removed, I see no need to continue the charade any longer").

### b. The Ongoing 1% of Sales Is Eliminated

In the emails admitted at the preliminary injunction hearing, Defendant Mark Timon

admits that the 2016 consulting agreements eliminated his ongoing 1% of sales. On January 7,

2016, Mark Timon suggested to "kill of the concept of commissions."  Pl. Exs. 30, 35 (Mark

Timon agreed that they will "revert" to the 1% commission rate if a new agreement for payment is

not reached by March 30, 2017).  Additionally, Mark Timon admitted that the payments detailed

to be made pursuant to the ongoing 1% of sales was intended to provide him with outstanding

payments of the original $10 million purchase price, not a separate agreement with separate

consideration.  *See* Pl. Ex. 34 ("Indeed, the payments are not commissions at all.  They are instead

payments measured off against $6 million of the interests purchase price for New England Greens. They have, in fact, always been capital gains disguised as commissions, doubling the tax burden they endanger").

### c. The 20% Membership Interest Is Converted to a 20% Residual Interest

During the 2016 negotiations, Defendants and NEG agreed to convert Mark Timon's 20% membership interest in NEG to a residual interest that would only entitle him to a distribution if the company was liquidated at some indefinite future date. While there are numerous examples of why this is so and how the conversion occurred, it is perhaps best explained in the emails included in the email chain James Schulwolf testified that he sent to Mark Timon in Exhibit 43. In them, James Schulwolf, Mark Timon, and Theodore Parker go back and forth discussing the differences between being a full member and having a residual interest, at the end of which James Schulwolf and Theodore Parker give Mark Timon an option of which he would like to be and Mark Timon replies "[w]ell, this looks like a fine way to manipulate me into capitulating to residual interest." Pl. Ex. 43.

Throughout the emails, there are other instances that show Mark Timon's 20% interest in NEG was converted from full membership in NEG to a residual or liquidation interest in the 2016 consulting agreements. Pl. Ex. 36 (James Schulwolf stating that the agreements would be updated to "reflect what we discussed (e.g. extension of the consulting term and conversion of the 20% membership interest)"; Pl. Ex. 37 (James Schulwolf stating: "As we discussed when we spoke a few weeks ago, and as the Parkers have discussed with Mark, that interest needs to be converted so that Mark retains his right to receive 20% of the net sale proceeds if the company is sold but no longer holds a full membership interest in the company. As I indicated when we spoke, as long as Mark is a member, the company is required to disclose his bankruptcy on any financial

application, and this is impairing, and has impaired, the company's ability to secure grants and other financing which would benefit the company (and therefore benefit Mark as well).  In addition, the conversion would simplify Mark's tax position, as he would not have to deal with allocations and tax distributions, and would make it easier for him to file his tax returns more quickly, as he would not have to wait for the company to deliver a K-1 to him in order to file"); Pl. Ex. 38 (Mark Timon stating that he agreed that through the new agreements he is "essentially giving up my 20% interest").

Moreover, in Mark Timon's own words, he described the 20% interest as "my greatest asset" and the conversion to a residual interest converting its value to "nothing":

> My rights and flexibility related to the 20% interest that might allow me to sell or collateralize the interest is effectively removed through conversion to residual interest per the new Section 9.  Section 9 removes my control, and cedes all rights associated with my 20% to NEG, except for 20% of net proceeds from sale or liquidation…  In short, Section 9 represents a great win for NEG, and a simultaneous loss of my greatest asset, as its value is effectively reduced to nothing.

Pl. Ex. 39; *see also* Pl. Ex. 40 ("I believe it serves Ted, Paige and NEG to keep the 20% off the books, for it takes my personal finances out of any company negotiations for loans or grants. At this late point in my tenure with NEG, it is not necessary to press my claim for 20% interest. Only compensation is necessary… [the draft agreement] reconfigures the agreement to one covering the clearance of the original purchase price for the company, without reference to any current minority interest held by me…  It simply converts the remaining payments to equity, which they actually are based on original intent").

### d. Payments to Defendants Pursuant to the 2016 Consulting Agreements

Defendant Mark Timon, Bloomer Press, and Ringmaster Events received payments from NEG pursuant to the 2007 Consulting Agreement and the 2016 Consulting Agreements.  *See* Pl. Ex. 1-4 (showing payments made from NEG to Bloomer Press and Ringmaster from October 2016-May 8, 2019); Pl. Ex. 9 (summarizing payments made from NEG to Mark Timon, Ringmaster, and Bloomer); Pl. Ex. 20-28 (confirming wire transfers from NEG to Mark Timon and payments to Bloomer Press deposited in Mascoma Bank accounts).

Pursuant to the original purchase agreement under the guise of the 2007 Consulting Agreement and then renegotiated as the 2016 Consulting Agreements, NEG paid Defendants through payments to Defendant Mark Timon or entities Defendants own, manage, or control: $452,405.09 in 2014; $528,000.00 in 2015; $583,200.00 in 2016; $600,930.13 in 2017; $480,956.54 in 2018; and $290,080.80 in 2019.  *See* Pl. Ex. 9.  In total, $2,935,572.43 over five years (in addition to what Defendant Mark Timon was paid under the 2007 Consulting Agreement in years 2008 through 2013).  According to banking records introduced, Defendants frequently transferred money between accounts, including their personal accounts and the accounts of the entities they own, manage, or have control over, and that Defendants have dissipated nearly all of the funds paid by NEG.  *See* Pl. Exs. 20-28.

## F.     Motion for Preliminary Injunction

In their motion for injunctive relief, the United States argues that the evidence at the hearing demonstrates that Defendants traded away Mark Timon's 20% ownership interest in NEG and the ongoing 1% of sales, on which the IRS had a lien.  *See* Dkt. No. 47 at 16.  As such, the United States seeks an order freezing all assets traceable to payments made by NEG to Defendants or their entities from December 2014, to February 2019, arguing that a substantial portion of those payments were subject to the pre-bankruptcy tax liens (at least the 1% and amounts equal to 20%

of the company profits.  Based on the information learned in preparation for and presented at the

hearing, the United States further argues that a preliminary injunction should be issued to freeze

all assets traceable to all payments made from NEG to Mark Timon, Debora Timon, or any

entities owned, managed, or controlled by them on or after December 2014 because all payments

are actually payments made for the balance of the 2006 purchase of NEG, a pre-petition asset, on

which the IRS's liens have attached.  The United States also maintains that Defendants' actions in

respect to the renegotiation in 2016 makes them liable to the United States for tortious conversion

of the tax liens in the total amount received by them since July 2016 (assuming *arguendo* they

prevail on Count III, which would otherwise cover the same liability another way).

In response, Defendants contend that the Court should deny the motion because Plaintiff

has failed to demonstrate that payments received by them were subject or traceable to the IRS's

lien.  *See* Dkt. No. 46 at 12.  Moreover, Defendants contend that the United States has failed to

demonstrate irreparable harm and that, in balancing the hardships, Defendants "will suffer more

economic harm if required to further substantiate that payments received were for services

performed when, in fact, there is no credible evidence that such payments were equity

distributions."  *Id.*  Specifically, Defendants argue that the lien on the 20% interests in NEG that

passed through the bankruptcy cannot be attached to earnings from the consulting contracts for the

following reasons:

> (a) payments received from NEG were earned income that were
> never the subject of Plaintiff's tax lien; (b) the July 2016 Amended
> Consulting Agreement did not replace Mr. Timon's twenty percent
> (20%) interest in NEG; (c) nor did it convert full interests to
> residual or liquidation interests; (d) the twenty percent (20%)
> interest assigned to Mr. Timon was treated as residual interest from
> the start and retains that status today as Plaintiff's exhibits 30
> through 44 and James Schulwolf's testimony confirms; (e) Mr.
> Timon's K-1s for 2015 and 2015 showed limited or other

membership status and $0.00 in distributions; (f) balance sheets for 2014 and 2015 corroborate Mr. Timon's lack of equity status; his interest was, therefore, ineligible for distributions; (g) the July 11, 2016 letter from Smith, Watson placed his loss of membership at December 31, 2015. That act confirmed that his liquidation (residual) interest would receive no distributions; and (h) no consulting payments or commission payments from any consulting agreement could, therefore, be derived from the twenty percent (20%) interest subject to lien. The lien cannot subsequently be expanded to earnings from consulting agreements or to any post-confirmation assets purchased by the Defendants.

*Id.* at 15.

### III. DISCUSSION

Pursuant to 26 U.S.C. § 7402(a), a district court may issue injunctions "appointing receivers, and such other orders and processes, and to render such judgments and decrees as may be necessary or appropriate for the enforcement fo the internal revenue laws." The court has discretion to grant preliminary injunctive relief. *See* Fed. R. Civ. P. 65. Freezing assets is appropriate in a tax collection case because the collection of "tax is not like an ordinary claim; the [United States] need not wait for judgment in order to levy execution[.]" *United States v. Morris & Essex R. Co.*, 135 F.2d 711, 713 (2d Cir. 1943) (citation omitted). Following a tax assessment, the United States may collect tax through the "power of distraint and seizure by any means." 26 U.S.C. § 6331; *see also Morris & Essex R. Co.*, 135 F.2d at 713.

In is well established that liens survive bankruptcy. *See Dewsnup v. Timm*, 502 U.S. 410, 418 (1992). Pre-bankruptcy liens on any pre-bankruptcy rights or interests therefore transfer to any other assets received in exchange for the assets or rights to payment transferred. *See Phelps v. United States*, 421 U.S. 330, 334 (1975) (holding that a tax lien reattaches to whatever is substituted for the item subject to the lien); *see also Municipal Trust and Sav. Bank v. United States*, 114 F. 3d 99, 101 (7th Cir. 1997) ("And although the statute refers to property belonging to

20

the taxpayer, it was established long ago that the lien follows any property substituted for what the taxpayer owned, provided that the chain of substitution can be traced").

In the present matter, the evidence admitted at the hearing demonstrated that Defendant Mark Timon admitted that he traded away his 20% membership interest and 1% of ongoing sales commissions for monthly fixed payments. *See* Pl. Exs. 30-44; *compare* Pl. Ex. 5 *with* Pl. Exs. 6-8. Moreover, Mark Timon admitted that the 2007 Consulting Agreement was actually a "guise" or a "charade" created at the time the Parkers purchased NEG from Defendants to account for $6 million of the $10 million purchase price. *See* Pl. Exs. 30-44. Since the 2007 Consulting Agreement was part of the 2006 sale of NEG to the Parkers by the Timons, the United States has demonstrated that it is likely a pre-bankruptcy asset to which the IRS's pre-bankruptcy lines attach and the substitute items (the payments made under the 2007 Consulting Agreement and then the 2016 Consulting Agreements) would also be subject to the pre-petition lien. *See Phelps*, 421 U.S. at 334. Defendants' contention that this was not part of the pre-bankruptcy purchase price is contrary to Mark Timon's admissions and the other evidence presented at the hearing.

Moreover, in balancing the hardships, the request to enter an injunction freezing assets traceable since December 2014 to payments made by NEG to Defendants and any entity they own, manage, or control, is not harmful or excessive. The money remaining in the accounts traceable to Defendant Mark Timon and Bloomer Press is nominal. Additionally, Defendants have acknowledged that Mark Timon receives approximately $31,000 per year from Social Security and Debora Timon is employed and earns "$35,297.60 per year." Dkt. No. 18-6 at ¶ 5; Dkt. No. 18-1 at ¶ 19. As such, the Court finds that Defendants have failed to demonstrate that the requested injunctive relief would be an undue burden.

Accordingly, the Court finds that the statutory provisions under 26 U.S.C. § 7402(a) have been satisfied and that a preliminary injunction is necessary and appropriate to enforce the internal revenue laws. *See First Nat. City Bank*, 379 U.S. at 384-85. Additionally, the United States has demonstrated that it will suffer irreparable harm and that it is likely to succeed on the merits of its claims. As such, the motion for a preliminary injunction is granted.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth herein, the Court hereby

**ORDERS** that The United States' motion for a preliminary injunction (Dkt. Nos. 5 & 14) is **GRANTED**; and the Court further

**ORDERS** that, the previous temporary restraining order is incorporated into this Order and extended, including the requirement that New England Greens continue to promptly supply documents and other information requested by counsel for the United States limited to information or documents reflecting or relating to past payments, the reasons for such payments, and the amounts previously paid to Mark L. Timon, Debora M. Timon, or any entity owned, controlled, or managed by Defendants Mark L. Timon or Debora M. Timon; and the Court further

**ORDERS** that Defendants and any persons on actual notice of this Order are enjoined from transferring, expending, encumbering, or dissipating any funds or other assets that are traceable directly or indirectly to any funds paid between December 1, 2014, and February 2019 by New England Greens, LLC to Defendants Mark L. Timon and Debora M. Timon or any entity owned, managed, or controlled by either Mark L. Timon or Debora M. Timon pending the ultimate decision in this matter. Defendants Mark L. Timon and Debora M. Timon shall immediately notify any other persons or entities to which any such funds or assets were

transferred for less than full consideration in money or money's worth that this Order applies to them as well, excluding transferees who received less than $10,000 cumulatively. This includes relatives, trustees of any trust, or any other persons to whom any such transfers were made or in whose name assets may have been purchased using such traceable funds; and the Court further

**ORDERS** that Defendants Mark L. Timon and Debora M. Timon, shall, within thirty (30) days of this Order, provide to the United States a complete and detailed accounting as follows:

A.   Defendants shall identify all accounts into which any payments after December 1, 2014, by New England Greens, LLC, to Mark L. Timon, to Debora M. Timon, and/or to any entity owned, controlled, or managed by Mark L. Timon or Debora M. Timon (collectively, the "Post-12/1/2014 Payments") were deposited or subsequently transferred.

B.   Defendants shall provide a complete and detailed accounting of any and all disbursements or expenditures of $3,000 or more from any and all financial accounts into which more than $3,000 of any Post-12/1/2014 Payments were deposited or into which such payments were transferred directly or indirectly from accounts into which there were initially deposited. The aforementioned accounts need not be in the name of Defendants Mark L. Timon or Debora M. Timon, but rather include any and all accounts that contain or contained funds traceable directly or indirectly to the Post-12/1/2014 Payments from New England Greens, LLC. The accounting shall include monthly or other periodic account statements and an explanation for the over-$3,000 withdrawals, checks, or other drafts; and the Court further

23

**ORDERS** that any of the Restrained Parties may apply to the Court for modification of any of the above provisions of this Order, for good cause shown.

**IT IS SO ORDERED.**

Dated: September 29, 2021
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

24